## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA
## PITTSBURGH DIVISION

-----------------------------------------------------------

CHRIS LYNCH, individually and
on behalf of all other persons similarly situated,        Civil Action No.: _____

      Plaintiff,        **COMPLAINT AND JURY DEMAND**

v.

GENERAL NUTRITION CORPORATION,

      Defendant.

-----------------------------------------------------------

## CLASS ACTION COMPLAINT

Plaintiff CHRIS LYNCH, individually and on behalf of a class of persons similarly situated (the "Class" or "Class Members"), brings this action against GENERAL NUTRITION CORPORATION ("GNC" or "Defendant") for its sale of dietary supplements adulterated with Picamilon or BMPEA. Plaintiff states and alleges as follows upon information and belief, based upon, *inter alia*, investigations conducted by and through his attorneys, except as to those allegations pertaining to Plaintiff personally, which are alleged upon knowledge. Plaintiff invokes this Court's jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).

## PRELIMINARY STATEMENT

1. Plaintiff Lynch brings this action against GNC because it repeatedly misrepresented that various products GNC sold in numerous stores throughout the United States were lawful dietary supplements when the products were actually adulterated and unlawful

497813.1

because they contained either Picamilon[1] or BMPEA,[2] potentially dangerous ingredients that do not meet the legal definition of a dietary ingredient and may not be lawfully used in dietary supplements.  Picamilon is a synthetic chemical designed to cross the blood brain barrier and is a prescription drug used in some countries, but not the United States, to treat various neurological conditions.  BMPEA is a synthetic chemical similar to amphetamine that is banned by the World Anti-Doping Organization.  In addition to selling products containing Picamilon and BMPEA, GNC sold products that it knew or should have known had been spiked with BMPEA, without disclosing on the product's label that the product contained these unlawful ingredients.

2.      This action arises from Defendant's failure, despite its knowledge that the Products are dangerous and not fit for dietary purposes, to disclose and/or warn Plaintiff and other consumers.  Indeed, Defendant has undertaken to conceal vital information concerning the risks of the Product.

3.      Defendant knew or should have known that Plaintiff and Class members would suffer damages as the result of using the Product.  Defendant's failure to disclose the dangers with the Products about which it knew or should have known constitutes fraud, negligent misrepresentation and unfair, unlawful, fraudulent, and deceptive business practices.

4.      Plaintiff and other Class members have been damaged by Defendant's concealment and non-disclosure of the dangerous nature of the Products and were misled into purchases.  Notwithstanding its knowledge, and complaint it has received concerning dangers associated with Products, Defendant has failed and/or refused to provide an adequate remedy.

---

[1]  Picamilon is also known as nicotinoyl-GABA, pycamilon, picamilone, pikatropin, and pikamilon.

[2]  BMPEA is also known as βMePEA, R-beta-methylphenthylamine, R-beta-methylphenethylamine HCl, Beta-methylphenethylamine, β-methylphenethylamine, 1-amino-2-phenylpropane, 2-phenylpropan-1-amine, 2-phenylpropylamine, alpha-benzylethlamine, 1-phenyl-1methyl-2-aminoethane, Beta-methylbenzeneethanamine, Beta-phenylpropylamine, 2-phenyl-1-propanamine.

As a result of Defendant's practices, Plaintiff and the other Class members have suffered injury in fact, including economic damages.

## PARTIES

5.     Plaintiff Lynch is a resident of Iowa.  Plaintiff purchased Redline Ultra Hardcore in May 2015 at the GNC store in the Jordan Creek Mall in Iowa.  Plaintiff Lynch talked with a sales representative and reviewed information available to him.  At no time did GNC or its representatives make known to him that Redline Ultra Hardcore contained ingredients that may not be lawfully used in dietary supplements, specifically Picamilon and BMPEA.

6.     If Plaintiff had known that these products were unsafe and unlawful, he would not have purchased the products or would have spent materially less to purchase them. Plaintiff did not receive the benefit of their bargain.  Further, neither GNC nor its representatives ever advised Plaintiff of any health or safety risks associated with the unlawful and unsafe GNC products sold to him containing Picamilon and/or BMPEA.

7.     General Nutrition Corporation is incorporated under the laws of Pennsylvania.  Its principal place of business is located at 300 Sixth Avenue, Pittsburgh, Pennsylvania.  GNC describes itself as a leading global retailer of health and wellness products, including vitamins, minerals, dietary supplement products, sports nutrition products and diet products.  Its company-owned retail stores and its franchisee's stores sell GNC products under GNC's proprietary names and under third-party names in stores across the United States, including in Pennsylvania.

8.     GNC is a merchant in the trade of food supplements.  As alleged above, GNC sells substantial amounts of health and wellness products, including nutritional supplement products.  GNC claims on its website that "GNC sets the standard in the nutritional supplement industry."

## JURISDICTION AND VENUE

9.     The claims described in this Complaint arise from GNC's sale of putative dietary supplements in Pennsylvania and throughout the United States.

10.     This Court has original jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332 (d) ("CAFA").   CAFA applies to grant federal jurisdiction where three conditions are met:  (1) there must be diversity, which occurs when any class member is a citizen of a state different from any defendant; (2) there must be 100 or more class members; and (3) the amount in controversy exceeds $5 million.  28 U.S.C. §§ 1332 (d) (2), 1332 (d) (2) (A), and 1332(d) (5) (B).  Each of these requirements is satisfied here.

11.     Plaintiff is a putative class representative and class member who is a citizen of a state different from the Defendant.  28 U.S.C. § 1332 (d) (2) (A)

12.     The class is comprised of thousands of members geographically disbursed throughout the Commonwealth of Pennsylvania and the United States.

13.     The aggregated claims of the individual class members exceed $5 million.

14.     This Court also has original jurisdiction because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.  28 U.S.C. § 1332 (a).

15.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

16.     GNC regularly conducts business in this District, including sales to Class Members, and a substantial part of GNC's acts or omissions giving rise to the claims occurred within this District.

17.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## FACTS COMMON TO ALL CLAIMS

**GNC Controls And Is Responsible For Third-Party Products Sold In GNC Stores**

18.     GNC reviews and pre-approves all labels, packaging, advertising and marketing materials for third-party products sold in its stores.  Third-party vendors may not make changes to a product's formula, label, or store advertising without GNC's express permission.  On occasion, GNC approves changes in a third-party vendor's product ingredients.  For example, on one occasion, GNC approved a third-party vendor's proposal to reformulate a product by substituting acacia rigidula for ephedra.

19.     GNC works closely with third-party vendors to ensure that labeling and marketing materials comply with GNC's requirements and expectations.  Suppliers are expected to make labeling changes – such as adding GNC-approved warnings – as necessary.

20.     GNC reviews the scientific literature on many of the ingredients used in third-party products.  For example, on December 8, 2014, an e-mail exchange between Jennifer Jakel, GNC's Senior Project Manager for Technical Research, and Christina Middleton, Associate Project Manager, discussed the scientific literature "regarding ingredients from 3rd party products."  Based on Ms. Middleton's review of the literature, Ms. Jakel decided which ingredients "looked promising" for possible development by Nutra Manufacturing ("Nutra"), GNC's manufacturing arm.  Nutra manufactures and supplies vitamins and supplements to GNC and other third-party companies.

21.     GNC's third-party vendor agreement provides that the "Vendor Warrants that the Goods covered by this purchase order have been manufactured, packaged, stored and shipped in accordance with the applicable standards of Good Manufacturing Practices promulgated under the Food, Drug and Cosmetic Act (21 U.S.C. § 301 ET SEQ, hereinafter "the Act") and

requirements of all applicable federal, state and local laws, rules and regulations." Based on this language, GNC maintains that it is not liable for unlawful third-party vendor products sold at GNC stores or sold by GNC over the Internet. However, at least for products that contain Picamilon or BMPEA, although GNC received guarantees from third-party vendors that products containing these ingredients complied with legal requirements, GNC did not rely on these guarantees in good faith, because GNC knew or should have known that these ingredients were unlawful, and that products containing these ingredients are deemed to be adulterated.

22.     GNC represents on its website that "GNC sets the standard in the nutritional supplement industry by demanding truth in labeling, ingredient safety and product potency, all while remaining on the cutting-edge of nutritional science," and that "GNC requires its vendors to be honest, ethical, reliable and capable of providing products that meet our high standards of quality." Unfortunately, GNC's representations are untrue. As described below, GNC sells products obtained from third-party vendors that GNC knows or should know contain unlawful and potentially unsafe ingredients and GNC sells third-party products that GNC knows, or should know, have labels that are deceptive.

23.     According to its 10K, Annual Report, 2014, p. 12, GNC focuses on its dietary category:

> The diet category is cyclical, with new products generating short-term sales growth before generally declining over time, making sales trends within this category less predictable than in our other product categories. We have reduced our exposure to the diet category with our GNC proprietary line, Total Lean ™, which is more focused on meal replacement and represents a more stable line of business. In 2014, company-owned domestic retail sales from diet products.

24.     GNC pre-approves all labels, packaging and advertising materials for third-party sales items, such as the Products, sold in its stores. GNC does so after reviewing and vetting the materials to ensure that they meet its requirements and expectations.

**PICAMILON**

25.     Picamilon was developed by researchers in the former Soviet Union and is currently a prescription drug in Russia used to treat a variety of neurological conditions.  It has never been approved as a prescription or over-the-counter drug in the United States.

26.     Picamilon is a neurotransmitter (gamma-aminobutyric acid or GABA) that has been synthetically modified in order to facilitate its translocation across the blood-brain barrier. Picamilon is formed by synthetically combining nicotinic acid (niacin) with GABA.  There is no indication in the literature that this compound is found in nature.

27.     A "dietary ingredient" under section 201(ff)(1) of the Act is "(A) a vitamin; (B) a mineral; (C) an herb or other botanical; (D) an amino acid; (E) a dietary substance for use by man to supplement the diet by increasing the total dietary intake; or (F) a concentrate, metabolite, constituent, extract, or combination of any ingredient described in clause (A), (B), (C), (D), or (E)."  21 U.S.C. § 321 (ff) (1).

28.     Picamilon does not fit any of the dietary ingredient categories in section 201 (ff) (A) − (F) of the Act.  (Exh. 1, Decl. of FDA Acting Deputy Director, Division of Dietery Supplement Programs, Dr. Cara Welch).  Thus Picamilon is not a lawful dietary ingredient and products that contain Picamilon are not lawful dietary supplements and may not be lawfully sold in the United States.   Under the Act, products that contain Picamilon are deemed to be adulterated.

29.     GNC's manufacturing arm Nutra does not manufacture products that contain Picamilon, presumably because GNC knows that Picamilon is not a lawful dietary ingredient. GNC obtains products that contain Picamilon for sale in GNC stores through third-party vendors.

30.     As early as May 22, 2007, GNC knew that Picamilon is not a lawful dietary ingredient.  On that date, GNC's Senior Project Manager for Technical Research Jennifer Jakel, whose responsibilities include insuring that labeling and scientific claims are accurate, reviewed the available literature regarding Picamilon.

31.     All the documents reviewed by Ms. Jakel had been translated from Russian. Among the documents reviewed by Ms. Jakel was a review of Picamilon, which among other things describes Picamilon as one of "a new class of medicinal preparations called nootropics which are finding increasingly wider applications in various areas of medicine.  Nootropic medications are adopted successfully for breakdowns of memory, attention, learning, and for treatment of loss of brain blood circulation, brain trauma chronic alcoholism and other disorders."  (Exh. 2).

32.     Ms. Jakel also learned from this same document that Picamilon was "synthesized in 1969 by the All-Union Scientific Research Institute and studied in the NII pharmacological RAN.  By chemical structure Picamilon is a derivative of the gamma-amino-butyric acid and nicotinic acid."  (underlined by Ms. Jakel).  Thus, as early as May 22, 2007, GNC knew that Picamilon was a synthetic drug created by Soviet investigators and not a lawful dietary ingredient in the United States.

33.     GNC also knew that Picamilon is not a lawful dietary ingredient because as part of her May 2007 review, Ms. Jakel documented in the GNC library file on Picamilon:  "No NDI that I could find."

34.     A "New Dietary Ingredient" ("NDI") notification is required by federal law before a dietary ingredient not used in the United States before 1994 may be used in a dietary supplement.  The NDI notification must be submitted 75 days before the ingredient is sold and

must include information that supports the manufacturer's or distributor's belief that the product is safe.  Only if FDA takes no action during the 75-day period may the New Dietary Ingredient be used in dietary supplements sold in the United States.

35.     In April 2014, Ms. Jakel again looked for an NDI notification for Picamilon and documented in her file "still no NDI found."  (Exh. 3).

36.     Even if GNC did not actually know that Picamilon is not a lawful dietary ingredient (which it did), had GNC conducted a reasonable diligence review, GNC would have known that Picamilon did not fulfill dietary ingredient categories in section 201 (ff) (A)-(F) of the Act.

37.     When GNC sells products that contain Picamilon in Pennsylvania and throughout the United States, GNC represents that the product is a lawful dietary supplement that contains lawful dietary ingredients.

38.     Despite the fact that GNC knew, or should have known, that Picamilon was a prescription drug used in Russia and not a lawful dietary ingredient in the United States, and that products containing Picamilon are not lawful dietary supplements, GNC sold thousands of units of products in Pennsylvania and throughout the United States that contained Picamilon.  These products were falsely labeled and sold as if they were lawful dietary supplements when in fact they were not.  Between January 2013 and June 2015, GNC sales of products that contain Picamilon were as follows:

**PICAMILON PRODUCTS**

| DESCRIPTION | VENDOR |
|---|---|
| Charge Extreme Energy Booster | Labrada Bodybuilding Nutrition |
| Lean Body for Her Fat Burner | Labrada Bodybuilding Nutrition |

| DESCRIPTION | VENDOR |
|---|---|
| Lean Body Hi Energy Fat Burn | Labrada Bodybuilding Nutrition |
| Testek | QNT International, Inc. |
| Riptek V2 | QNT International, Inc. |
| Tru Mangodrin | Truderma, LLC |
| Turbo Shred | Swole Sports Nutrition |
| Jacked Pack | BD Health Partners |
| Mr. Hyde – Fruit Punch | Prosupps USA LLC |
| Mr. Hyde – Watermelon | Prosupps USA LLC |
| Dr. Jekyll – Power Punch | Prosupps USA LLC |
| Dr. Jekyll – Watermelon | Prosupps USA LLC |
| Mr. Hyde – Orange Guava | Prosupps USA LLC |
| Vanish Bonus | Prosupps USA LLC |
| Mr. Hyde – Red Razz | Prosupps USA LLC |
| Mr. Hyde RTD Blue Razz | Prosupps USA LLC |
| Mr. Hyde Blue Razz | Prosupps USA LLC |
| Blue Razz RTD Fruit Punch | Prosupps USA LLC |
| Nirvana | Sensatus Group LLC |
| ENGN Fruit Punch | Evlution Nutrition |
| ENGN Blue Raz | Evlution Nutrition |
| ENGN Green Apple | Evlution Nutrition |

39.     On June 16, 2015, pursuant to ORS 646.618, the Attorney General for the State of Oregon issued an Investigative Demand to GNC Holdings, Inc., (Defendant's parent company). The Investigative Demand sought production of documents and information relating to Defendants' sale of Picamilon.  The Investigative Demand clearly discussed the likelihood that Picamilon was not a lawful dietary ingredient.  Defendant was aware that GNC Holdings, Inc., was in receipt of the demand, and Defendant produced documents and information in response to the demand.  Despite this additional notice to GNC that Picamilon is an unlawful ingredient and that products that contain Picamilon are adulterated, GNC continued to sell products that contain Picamilon nationally and in Pennsylvania.  GNC did not cease selling such products until after Oregon's Attorney General issued a document entitled "Notice of Unlawful Trace Practices and Proposed Resolution" on September 21, 2015.  It was only after this document was served on GNC that GNC stopped selling products that contain Picamilon.

40.     In addition to the sales listed above, between May 22, 2007 (when GNC knew that Picamilon was not a lawful dietary ingredient) and January 1, 2013, and between June 2015 and Oregon's September 21, 2015 Notice, GNC sold a yet to be determined number of products that contained Picamilon in Pennsylvania and nationally.

**BMPEA**

41.     BMPEA is a chemical similar to amphetamine.  It was first synthesized in the 1930s as a replacement for amphetamine, but for unknown reasons it was never studied in humans.  There are anecdotal reports that BMPEA is associated with hemorrhagic stroke.[3] Because of its amphetamine-like qualities, BMPEA is banned for use by athletes by the World Anti-Doping Agency.

---

[3]  P. Cohen, *et al.*, *Hemorrhagic Stroke Probably Caused By Exercise Combined With A Sports Supplement Containing β-Methylphenylethymaline (BMPEA):  A Case Report*, Ann. Intern. Med. (published online 12 May 2015 doi; 10.7326L15-0106).

42.     BMPEA is not a lawful dietary ingredient because it does not fit any of the dietary ingredient categories in Section 201(ff)(A)-(F) of the Act.   Under federal law, any dietary supplement that contains BMPEA is deemed to be adulterated and may not be lawfully sold in the United States.

43.     GNC's manufacturing arm Nutra does not manufacture products that contain BMPEA, presumably because GNC knows that BMPEA is not a lawful dietary ingredient. However, GNC obtains products that contain BMPEA for sale in GNC stores through third-party vendors.

44.     BMPEA is synthetically produced and not found naturally. Although there is one published report4 that BMPEA is found naturally in the acacia rigidula ("AR") plant, this report provides little information regarding how the identification was made, and in 2013, FDA conducted a more credible analysis using a verified and well-accepted testing methodology that found AR does not, in fact, contain BMPEA.  The FDA study also found that 43% of the dietary supplements tested that were labeled as containing AR had been "spiked" with BMPEA.[5] Among other things, the 2013 study reported that BMPEA is a synthetic substance similar to amphetamine.  Thus, anyone aware of the 2013 study would know that BMMPEA is not a lawful dietary ingredient and that products labeled as containing acacia rigidula were at significant risk of being spiked with BMPEA.

45.     Even before the 2013 FDA study, GNC should have known that BMPEA is not a lawful dietary ingredient because BMPEA does not fit any of the dietary ingredient categories in Section 201 (ff) (A)-(F) of the Act.

---

[4] BA. Clement *et al*, *Toxic Amines And Alkaloids From Acacia Rigidula*, Phytochemistry 1377-1380

[5] Pawar *et al*., *Determination Of Selected Biogenic Amines In Acasia Rigidula Plant Materials And Dietary Supplements Use lc-MS/MS Methods*, Journal of Pharmaceutical and Biomedical Analysis 88 (2014).

46.     GNC knew of the FDA study as early as November 2, 2013, when GNC's Senior Project Manager for Technical Research Jennifer Jakel was notified by a PubMed service that the study was available on line.

47.     On November 18, 2013, USA Today published an article about the FDA study.[6]

48.     The FDA study became widely known throughout GNC on November 19, 2013, when Ms. Jakel circulated the USA Today article to approximately 100 recipients at GNC headquarters.  Among those recipients was GNC's Senior Vice President and Chief Innovation Officer Guru Ramanathan.  GNC Vice President General Counsel, Regulator Affairs, David J. Sullivan, was another recipient of the USA Today article.

49.     The USA Today article stimulated significant concern and discussion within GNC.  For example, within minutes of receiving the email from Ms. Jakel, Merchandising Manager Carter Gray wrote to GNC Director of Merchandising John Telencho, "Please tell me we won't have to get rid of acacia now."  (Exh. 4).

50.     Shortly after receiving the *USA Today* article, GNC Director of e-Commerce Nathanial Kennedy learned of six products sold by GNC with acacia rigidula.  Later that day, Brian Cavanough, GNC's Senior Vice President of Merchandising wrote to Steve Cherry, the Vice President of Purchasing, and David J. Sullivan, GNC's Vice President and General Counsel, offered to do a "database search to find all SKUs" associated with affected products.

51.     Despite widespread knowledge that the AR products sold by GNC were at high risk of having been spiked with BMPEA, including knowledge by David J. Sullivan, GNC's Vice President and General Counsel, Regulatory Affairs, GNC continued to sell products that

---

[6] http://www.usatoday.com/story/news/nation/2013/11/18/fda-scientists-find-amphetime-like-compound-in-dietary-supplements/3627963/.

contained AR without testing these products to determine whether the product was adulterated with BMPEA or informing consumers of the risk that these products were adulterated.

52.    GNC also continued to sell products that were labeled as containing BMPEA even though it knew or should have known from the 2013 FDA study that BMPEA is a synthetic substance similar to amphetamine and was not a lawful dietary ingredient.

53.    Also after the 2013 FDA study, GNC approved inclusion of AR in products supplied to GNC by a third-party vendor.  On February 21, 2014, supplier Riley Judd wrote to GNC employee Russell Barba that "Rhino Rush is currently reformulating the current ephedra version shot.  To replace the ephedra, they would like to use Acacia Rigidula (leaves) – is this ingredient acceptable."  Barba then checked with GNC's Beth Curtin who approved Rhino Rush's use of AR.

54.    On March 12, 2014, the Food Standards Agency of the European Union (EU) contacted GNC and other sellers of AR products to inform them that AR was a "novel food product" and could not be sold in the EU because, among other things, its safety had not been demonstrated.

55.    In November 2014, the newsletter *NutraIngredients-USA* reported that Danish and Swedish regulatory agencies had issued warnings that a dietary supplement labeled as containing AR that was spiked with BMPEA may have caused a hemorrhagic stroke.  This newsletter was widely distributed throughout GNC headquarters.

56.    In December 2014, Health Canada (the Canadian equivalent to FDA) announced a recall of the AR labeled dietary supplement "Jet Fuel Superburn" because it was spiked with undisclosed BMPEA.  At the time of the Health Canada recall, GNC sold Jet Fuel Superburn and other dietary supplements labeled as containing AR and at risk of containing BMPEA, and

continued to sell those products in Oregon and the United States even after the Health Canada recall.

57.    In April 2015, researchers reported the results of yet another study (the "Cohen Study") that found more than 50% of tested dietary supplements labeled as containing AR were spiked with BMPEA.[7]  The list of products tested in the Cohen Study that were found to contain undisclosed BMPEA included products GNC sold in the United States and Pennsylvania.

58.    The Cohen Study received significant national media attention.  On April 23, 2015, after the results of the Cohen Study became widely known, FDA formally announced that BMPEA does not meet the statutory definition of a dietary ingredient and sent warning letters to manufacturers whose products contain BMPEA.

59.    It was only after FDA made its formal announcement that GNC stopped selling products that contain BMPEA, including products labeled as containing AR that were spiked with BMPEA.

60.    The Oregon Department of Justice (ODOJ) conducted its own testing of three dietary supplements sold by GNC in Oregon:  Jetfuel Superburn; MX-LS7; and Phenyl Core Weight Management.  These products were labeled as containing AR but were not labeled as containing BMPEA.  ODOJ's expert tested these products using a state-of-the-art methodology: rapid resolution liquid chromatography-accurate mass-quadrupole-time of flight-tandem mass spectrometry.  All three products tested positive for BMPEA.

61.    When GNC sold products in Pennsylvania and nationally that contained BMPEA, GNC misrepresented that the product was a lawful dietary supplement that contained only lawful dietary ingredients.

---

[7] Cohen *et al*., *An Amphetamine Isomer Whose Efficacy And Safety In Humans Has Never Been Studied β-methylphenethylaminine (BMPEA), Is Found In Multiple Dietary Supplements*, Drug Test Analysis DOI. 1002/dta 1793.

62.     From January 1, 2013, until May 2015, GNC sold in Oregon 340 units of seven different products that were labeled as containing AR.  All but one of these products tested (Green Coffee Bean+Energy) tested positive for the presence of BMPEA.

63.     Whether Green Coffee Bean+Energy was adulterated with BMPEA is unknown because before it could be independently tested, the product was reformulated.  On November 19, 2013, in an email that included a USA Today news article following up on the November 18th report about the FDA study, Charlie Chiaverini, the National Brand Manager for Rightway Nutrition (manufacturer of Green Coffee Bean+Energy), wrote to GNC employee Bob Emilian asking, "[O]bviously you would like us to reformulate as fast as possible and replace the inventory in the stores in warehouse with new inventory yes."  Mr. Emilian replied, "Yes for starters."

64.     After November 2013, when GNC knew that AR products were at significant risk of having been adulterated with BMPEA, GNC sold at least 27 AR products that were in fact adulterated with BMPEA.

65.     In addition, GNC sold at least 105 AR products after November 2013 without disclosing that these products were at significant risk of having been adulterated with BMPEA.

66.     The AR products sold between January 2013 and May 2015 are as follows:

**ACACIA RIGIDULA PRODUCTS**

| DESCRIPTION | VENDOR |
|---|---|
| Hit Fastin XR | Hi Tech Pharmaceuticals |
| Lipodrene XR | Hi Tech Pharmaceuticals |
| Fastin XR DMAA Free | World Health Products LLC |
| Green Coffee Bean+Energy | Rightway Nutrition |

| | |
|---|---|
| MX-LS7 | Isatori Global Technologies |
| Phenyl Core | |

67.     In addition to the AR products sold by GNC that contained undisclosed BMPEA, GNC also sold products that were labeled as containing BMPEA.  These products were falsely labeled as if they were a dietary supplement when, in fact, they were not dietary supplements because BMPEA is not a lawful dietary ingredient.  Between January 1, 2013, and May 2015, GNC sold the following products that were labeled as containing BMPEA:

**BMPEA LABELED PRODUCTS**

| DESCRIPTION | VENDOR |
|---|---|
| Fastin | Hi Tech Pharmaceuticals |
| Fastin DMAA Free | Hi Tech Pharmaceuticals |
| Meltdown Watermelon | VPX Sports, Inc. |
| Meltdown Peach Mango | VPX Sports, Inc. |
| Meltdown Exotic Fruit | VPX Sports, Inc. |
| Lipo 6 Black | Nutrex Research |
| Meltdown | VPX Sports, Inc. |
| Redline Ultra Hardcore Twinpk | VPX Sports, Inc. |
| Redline Ultra Hardcore Bonus | VPX Sports, Inc. |
| Redline Ultra Hardcore | VPX Sports, Inc. |
| Redline Hardcore Blister Pak | VPX Sports, Inc. |
| Fruit N.O. Shotgun | VPX Sports, Inc. |
| Grp Bgum Shotgun V3 | VPX Sports, Inc. |
| Craze - Candy Grape | Driven Sports |
| Vanish Bonus | Prosupps USA LLC |
| Shredz Burner | Shredz Supplements |
| Iso Lean 2 | Advanced Nutrition Systems |
| Iso Lean 3 | Advanced Nutrition Systems |
| Methyl Drive 2.0 | Advanced Nutrition Systems |

68.     GNC sold other products in Oregon before January 1, 2013 that contained BMPEA.  The number of these products has not yet been determined.

## CLASS ACTION ALLEGATIONS

69.     Plaintiff brings this action on behalf of himself and the members of the following two classes:

      a.     **Nationwide Class**:  All persons in the United States who purchased GNC products containing Picamilon or BMPEA.

      b.     **Iowa Class**:  All persons in Iowa who purchased who purchased GNC products containing Picamilon or BMPEA (collectively with the Nationwide Class,  the "Class").

70.     Subject to additional information obtained through further investigation and discovery, the foregoing Classes may be expanded or narrowed by amendment or amended complaint.  Specifically excluded from either Class is any entity in which Defendant had a controlling interest or which has a controlling interest in Defendant, and Defendant's legal representatives, assigns, and successors.

71.     Members of the Classes are so numerous that joinder is impracticable.  While the exact number of Class Members is unknown to Plaintiff, it is believed that the Class is comprised of at least thousands of members geographically dispersed throughout Iowa, the Commonwealth of Pennsylvania and nationally.  The Class, however, is readily ascertainable from information and records in GNC's possession.

72.     Common questions of law and fact exist as to all members of the Class.  These questions predominate over questions that may affect only individual Class Members because GNC has acted on grounds generally applicable to the Classes.  Such common legal or factual questions include:

      a.     Whether the Products are adulterated;

      b.        Whether GNC knew or reasonably should have known that the Products were adulterated;

      c.        Whether GNC concealed from and/or failed to disclose to the Class the Products' ingredients;

      d.        Whether GNC intentionally omitted the dangerous ingredients included in its Products;

      e.        Whether a reasonable consumer would consider the omitted information in purchasing any GNC product;

      f.        Whether GNC was unjustly enriched by the sale of the Products;

      g.        Whether GNC engaged in unfair, false, misleading, or deceptive trade practices by selling and/or marketing the Products;

      h.        Whether GNC should be ordered to disgorge all or part of the ill-gotten profits it received from the sale of the Products; and,

      i.        Whether Plaintiff and the Class are entitled to damages, including compensatory, exemplary, and statutory damages.

73.      GNC's defenses to Plaintiffs' claims are typical of its defenses to claims of the other Members of the Class.

74.      Plaintiff's claims are typical of those of the Members of the Class as all Members of the Class are similarly affected by GNC's actionable conduct.  Plaintiff and all Members of the Class purchased one or more of the Products.  In addition, GNC's conduct that gave rise to the claims of Plaintiff and those of Members of the Class is the same for all Members of the Classes.

75.     Plaintiff will fairly and adequately protect the interests of the Class because Plaintiff has no interests antagonistic to, or in conflict with, the Class that Plaintiff seeks to represent.   Furthermore, Plaintiff has retained counsel experienced and competent in the prosecution of complex class action litigation.   Plaintiff has or can acquire adequate financial resources to assure that the interests of the Class will not be harmed.

76.     Class action treatment is a superior method for the fair and efficient adjudication of this controversy in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender.   The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

77.     Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

78.     GNC has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

## CLAIMS FOR RELIEF

## COUNT I:  NEGLIGENT MISREPRESENTATION

79.     Plaintiff hereby re-alleges the preceding paragraphs.

80.     Plaintiff brings this claim on behalf of himself and the proposed Class.

497813.1

20

81.     Defendant had a duty to disclose to Plaintiff and the Class members the Product's actual quality and characteristics.

82.     Defendant negligently and/or carelessly misrepresented, omitted and concealed from consumers material facts relating to the quality and characteristics of its Products, including but not limited to that they contain Picamilon and BMPEA.

83.     These misrepresentations and omissions were material and concerned the specific characteristics and quality of its Products that a reasonable consumer would consider in purchasing any dietary supplement.

84.     Defendant made such false and misleading statements and omissions on its website and product labeling, and in its advertisements and warranties, with the intention of inducing Plaintiff and the Class members to purchase the Products.

85.     As a result of Defendant's misstatements, it was under a duty to disclose facts necessary to correct those misstatements.  Further, Defendant was in a better position to discover the misrepresentations than Plaintiff because Defendant controlled the Product's design, manufacturing, testing, and marketing processes.

86.     At the time it made the representations, Defendant knew, or by the exercise of reasonable care should have known, that the statements were false.

87.     Defendant advertised and marketed its Products with the intent to induce Plaintiff and Class members to purchase the Products.

88.     Defendant knew or, should have known, that without the misrepresentations and/or omissions, Plaintiff and the Class would not have purchased the unsafe products.

89.     Plaintiff and Class members justifiably relied upon Defendant's misrepresentations about the Product's quality and characteristics.

90.     Plaintiff and Class members were unaware of the falsity of Defendant's misrepresentations and omissions and, as a result, justifiably relied on them in deciding to purchase the GNC Products.   Had Plaintiff and Class members been aware of the true nature and quality of the Products, they would not have purchased it.

91.     As a direct and proximate result of Defendant's misrepresentations and omissions of material fact, Plaintiff and Class members have suffered and will continue to suffer damages and losses as alleged herein in an amount to be determined at trial.

## COUNT II – DESIGN DEFECT

92.     Plaintiff hereby re-alleges the preceding paragraphs.

93.     At all times during the Class Period, GNC designed and developed nutritional supplements, and commercially obtained, distributed, and marketed the Picamilon Products and BMPEA Products as nutritional supplements and sold them on a commercial basis to retail customers.

94.     The design of the Products, including the inclusion and combination of Picamilon and BMPEA, was and is defective, and because of such design defects, the GNC Products were and are defective and unreasonably dangerous to the consuming public, including the Plaintiff and the Class.   The Products have created an unreasonably dangerous condition and posed a substantial likelihood of harm at the time they were sold.

95.     The Products' defective design existed prior to any manufacturing process.

96.     The defect in Defendant's design of the Products existed at the time they were sold and/or when they left Defendant's possession or control.

97.     The risks inherent in the design of the Products outweigh the benefits of their design.

98.     The defective design remained unchanged and reached Plaintiff and Class in an unaltered state.

99.     The Products fail to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable by Defendant.

100.     Defendants' design of its Products proximately caused harm to Plaintiff, and the risk of danger in their design outweighs the benefits of the design.

101.     Upon information and belief, feasible alternatives existed to make the Products safer for their intended use at the time of their design.

102.     The GNC Products were expected to and did reach Plaintiff and the Class without substantial change to the condition in which they were manufactured and sold by Defendant. The Products are and were used as intended, and as reasonably foreseeable by Defendant.

103.     By reason of the foregoing, Defendant is liable to Plaintiff and the Class.

104.     The Products sold to Plaintiff and the Class by GNC were and are defective and unfit for their intended use.  The defects and unreasonably dangerous condition of the Products have proximately caused and will continue to proximately cause damage to Plaintiff and the Class.  Defendant could and should reasonably have foreseen the inherent risks created by utilizing the defective Products to Plaintiff and the Class.

105.     As a result of the foregoing, Plaintiffs and the Class have suffered damages as previously set forth herein that were directly and proximately caused by the defective Products.

106.     Plaintiffs and the proposed Class are entitled to damages in an amount to be determined at trial.

107.

## COUNT III – UNJUST ENRICHMENT

108.    Plaintiff hereby re-alleges the preceding paragraphs.

109.    Plaintiff and other Class Members conferred a benefit upon GNC.  Plaintiffs and Class Members paid money to GNC to acquire the Picamilon Products and BMPEA Products. Plaintiff and other Class Members paid more for the Picamilon Products and BMPEA Products than they should have, and more than they would have paid if they knew the products were adulterated.  Accordingly Plaintiff and the other Class Members conferred an economic benefit upon GBC because GNC profited as a result from Plaintiff and other Class Members paying money to purchase these products.

110.    GNC retained and appreciated the benefits conferred on it by Plaintiff and the other Class Members.

111.    GNC retained those benefits under circumstances that make it inequitable for GNC to retain the benefits without paying the value of those benefits.  Specifically, GNC retained those benefits despite the fact that the Picamilon Products and BMPEA Products were adulterated and unlawful but failed to disclose the fact that the Picamilon Products and BMPEA Products were adulterated and unlawful.  GNC knew or reasonably should have known that the Picamilon Products and BMPEA Products were adulterated and unlawful but still failed to disclose those products' ingredients to Plaintiff or the other Class Members.  Consequently, allowing GNC to retain the benefit under all these circumstances would be unjust.

112.    Plaintiff and the Class seek the disgorgement and restitution of Owens Corning's wrongful profits, revenue, and benefits, to the extent and in the amount deemed appropriate by the Court, and such other relief as the Court deems just and proper to remedy Defendant's unjust enrichment.

**COUNT IV:  VIOLATION OF THE PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS ACT, IOWA CODE CHAPTER 714H**

113.    Plaintiff repeats and realleges, as if fully set forth herein at length, each and every allegation contained in the above paragraphs and further alleges:

114.    Defendant has engaged in unfair, deceptive, untrue and misleading business practices in violation of Iowa law.

115.    Defendant has violated this statutory prohibition against engaging in unlawful acts and practices by, inter alia, making the representations and omissions of material facts with the "intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission" in connection with the sale of its garments.  Iowa Code Ann. § 714H.3.

116.    Pursuant to Iowa law, Defendant had a statutory duty to refrain from unfair or deceptive acts or practices in the manufacture, promotion, and sale of the Products to Plaintiff and the Class members.

117.    In connection with the sale of its consumer merchandise, Defendant engaged in unfair and deceptive acts and practices, as alleged in this Complaint, including, without limitation:

a.    Unfairly and deceptively misrepresenting the benefits and quality of its Products to its customers;

b.    Unfairly and deceptively advertising the actual ingredients of the Products; and

c.    Unfairly and deceptively omitting that the Products contain the unsafe compounds of Picamilon or BMPEA.

118.    As a result of the unfair and deceptive conduct of Defendant, Plaintiff sustained damages including but not limited to the damages detailed above, incorporated herein.

119.    Pursuant to the Iowa law, Defendant had a statutory duty to refrain from unfair or deceptive acts or practices in the manufacture, promotion, and sale of the dietary supplements to Plaintiff and the Class members.

120.    Defendant intended that Plaintiff and the Class members rely on its materially deceptive advertisements and misrepresentations and purchase its Products as a consequence of the deceptive practices.

121.    Defendant's deceptive representations and material omissions to Plaintiff and the Class members constitute unfair and deceptive acts and practices under Iowa Law.

122.    Defendant engaged in wrongful conduct while at the same time obtaining, under false pretenses, significant sums of money from Plaintiff and the Class members.

123.    Plaintiff and the Class members were actually deceived by Defendant's misrepresentations.

124.    As a proximate result of Defendant's misrepresentations, Plaintiff and the Class members have suffered ascertainable losses, in an amount to be determined at trial.

125.    Prior to filing this suit, counsel for Plaintiff received approval from the Attorney General of Iowa pursuant to Iowa Code § 714H.7.

## PRAYER FOR RELIEF

WHEREFORE, Named Plaintiff respectfully requests the following relief:

a.      Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more Classes as defined above;

b.      Appoint Plaintiff as the representative of the Class and counsel below as Class counsel;

c.      Award all actual, general, special, incidental, statutory, and consequential damages to which Plaintiff and Class members are entitled;

d.      Award pre-judgment and post-judgment interest on such monetary relief;

e.      Grant appropriate relief as requested herein.

f.      Award reasonable attorneys' fees and costs; and

g.      Grant such further relief that this Court deems appropriate.

## JURY TRIAL DEMANDED

Named Plaintiff demands a trial by jury on all issues so triable.

Dated  November 9, 2015         LEVIN, FISHBEIN, SEDRAN &BERMAN

By:    s/Charles E. Schaffer
Charles E. Schaffer
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3697
Telephone: 215-592-1500
Facsimile: 215-592-4663
cschaffer@lfsblaw.com

Robert K. Shelquist
Craig S. Davis
Rebecca A. Peterson
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN  55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
rkshelquist@locklaw.com
rapeterson@locklaw.com

Charles J. LaDuca
Brendan Thompson
CUNEO GILBERT & LADUCA, LLP
8120 Woodmont Avenue
Suite 810
Bethesda, MD  20814
Tel:     (240) 483-4292
Facsimile:     (202) 789-1813
charles@cuneolaw.com
brendant@cuneolaw.com

J. Barton Goplerud
Brian O. Marty
HUDSON MALLANEY SHINDLER &ANDERSON
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa 50265
Telephone:  515.223.4567
Facsimile:  515.223.8887
jbgoplerud@hudsonlaw.net
bomarty@hudsonlaw.net

***Attorneys For Plaintiff***